NO. COA13-1364

NORTH CAROLINA COURT OF APPEALS

Filed: 2 September 2014

KIRK ZUROSKY,
        Plaintiff-Appellant,

        v.                                Mecklenburg County
                                          No. 09 CVD 30462
ALYSON G. SHAFFER,
        Defendant-Appellee.


        Appeal by plaintiff from judgment and order entered on 8

November 2013 by Judge Paige B. McThenia in Mecklenburg County

District Court.  Heard in the Court of Appeals 8 May 2014.


        *Marshall & Taylor, P.C., by Travis R. Taylor, for
        Plaintiff-Appellant.*

        *Hamilton Stephens Steele + Martin, PLLC, by Amy Simpson
        Fiorenza, for Defendant-Appellee.*


        HUNTER, JR., Robert N., Judge.


        Kirk Zurosky ("Zurosky") appeals from a judgment and order

entered on 8 November 2013.  Zurosky argues (i) the trial court

erred in its distribution of marital property, and (ii) the

trial court erred in its ordering of alimony and child support.

After careful review, we affirm in part and reverse and remand

in part.

## I. Facts & Procedural History

Zurosky and Alison Shaffer ("Shaffer") married on 1 July 1995. Zurosky and Shaffer have two children. In December 2008, Zurosky stated his intention to leave the marital home. On 21 January 2009, the parties entered into an interim agreement ("Interim Agreement") which addressed the parties' separation, addressed the parties' financial responsibilities, and provided a temporary shared custody schedule for their two children. On 22 January 2009, the couple separated and Zurosky left the marital home.

Zurosky initiated the present lawsuit on 3 December 2009 and sought temporary and permanent child custody, equitable distribution, and a psychological evaluation of Shaffer. The complaint alleged Shaffer did not allow Zurosky to see his children according to the terms of the Interim Agreement. Shaffer filed an answer on 24 February 2010 generally denying the complaint's allegations and asserting counterclaims seeking child custody, child support, sequestration[1] of both the Providence Glen home (the marital home) and a black Lexus SUV, postseparation support, alimony, equitable distribution,

---

[1] "The process by which property is removed from the possessor pending the outcome of a dispute in which two or more parties contend for it." Black's Law Dictionary 1488 (9th ed. 2009).

attorney's fees, and requested an appraisal of Zurosky's interest in T&Z. Zurosky and Shaffer divorced in June 2010.

On 28 June 2010, the trial court held a hearing concerning temporary child support ("TCS") and post-separation support ("PSS"). On 6 August 2010, the initial equitable distribution pretrial conference scheduling and discovery order was entered. In compliance with this order, the parties filed equitable distribution affidavits, which were amended prior to entry of the final pre-trial order ("FPTO"). The FPTO contained stipulations and contentions regarding twenty-five marital and separate property items, seven marital and separate debt items, and six divisible property items. On appeal, Zurosky contends that the trial court did not comply with the FPTO with respect to five of those items: the value and distribution of two airline miles accounts, insurance policy disbursements, and tax refunds.

On 31 August 2011, the trial court entered a TCS and PSS order. On 7 September 2011, Zurosky filed a motion to alter or amend the TCS and PSS Order. On 21 October 2011, Zurosky filed a motion for sanctions, which was granted in part against Shaffer for failing to produce documents in a timely manner and comply with discovery requests.

The trial court held hearings and took evidence regarding custody, equitable distribution, permanent child support, and alimony from November 2011 to June 2012. The trial court received testimony from both parties, business valuation experts, real estate appraisal experts, furniture appraisers, jewelry appraisers, family members, friends, coworkers, and employees. On 10 April 2013, Judge McThenia entered an Equitable Distribution Judgment and Permanent Child Support and Alimony Order ("April Judgment & Order").

In the trial court's April Judgment & Order, the trial court referenced two exhibits. Exhibit A shows the distribution and value of household goods and Exhibit B shows the distribution of marital and divisible assets and liabilities. Neither exhibit was attached to the April Judgment & Order.

On 7 May 2013, Zurosky appealed the April Judgment & Order. On 17 May 2013, Shaffer also appealed the April Judgment & Order. Shaffer filed a Motion for Rule 60 Relief on 29 July 2013 to correct a clerical mistake in the April Judgment & Order. The motion alleged the trial court failed to attach certain exhibits to the April Judgment & Order. The motion was granted on 8 November 2013.

Following the appeals and Motion for Rule 60 Relief, the

trial court entered an Amended Equitable Distribution Judgment and Permanent Child Support and Alimony Order ("Amended Judgment & Order") on 8 November 2013, *nunc pro tunc* to 8 April 2013. The Amended Judgment & Order equitably distributed all marital property and contained 415 separate findings of fact. The trial court concluded an unequal distribution in favor of Shaffer, as outlined in the Amended Judgment & Order and attached exhibits, was equitable to both parties. In making its determination, the trial court made several findings addressing the factors laid forth in N.C. Gen. Stat. § 50-20(c) (2013):

> **(1) The income, property, and liabilities of each party at the time the division of property is to become effective.**
>
> Plaintiff/Husband's income greatly exceeded that of Defendant/Wife during the marriage and since the DOS. Unless something unexpected happens, Plaintiff/Husband's income is likely to always remain ten (10) to twenty (20) times higher than that of Defendant/Wife. This is perfectly illustrated by his 2012 distributions, which indicate that in one month Plaintiff/Husband grossed more than Defendant/Wife did in the entire 2011 year. Additionally, Plaintiff/Husband is now sharing the Providence Glen Home with Ms. Zurosky, who is an attorney who earns a substantial income of her own and can contribute to Plaintiff/Husband's future shared expenses.
>
> Not only does Plaintiff/Husband's income exceed that of Defendant/Wife, but also his career growth potential is also far greater

than that of Defendant/Wife. Defendant/Wife has a very specialized area of practice (i.e., behavioral analysis and work with children on the autism spectrum). She is always going to be limited by time and travel restraints and a market which continues to limit her area of specialization.

The Court considered the property and liabilities of the parties at the time of the division of the property as is shown on Exhibits "A" and "B." The facts found below are all that could be determined by the preponderance of the evidence. The property in the exhibits includes property to be distributed to the parties which is still in existence but does not include any distributive award which may be determined by consideration of these factors.

As evidenced in the attached exhibits, the assets of Plaintiff/Husband exceed those of Defendant/Wife.

**(3) The duration of the marriage and the age and physical and mental health of both parties.**

The duration of the marriage is thirteen and one half (13 1/2) years.

Defendant/Wife is four (4) years older than Plaintiff/Husband.

Plaintiff/Husband is in excellent health.

Defendant/Wife has health issues including asthma, chronic pain coupled with a skin disorder. It is anticipated that Defendant/Wife will only be able to manage these conditions as she ages, and that she will never be able to cure them. It is reasonable to assume that these painful

conditions will not subside in the future and will likely impair, to some extent, her ability to function effectively and/or her quality of life in the future.

**(4) The need of a parent with custody of a child or children of the marriage to occupy or own the marital residence and to use or own its household effects.**

Both parties have the minor children with them fifty percent (50%) of the time; but, Plaintiff/Husband has the former marital residence and will keep it for which the children will benefit. Plaintiff/Husband has sufficient household goods to maintain a comfortable living with the minor children in the Providence Glen Home.

**(5) The expectation of pension, retirement, or other deferred compensation rights that are not marital property.**

Plaintiff/Husband has a higher expectation of pension, retirement or other deferred compensation rights as co-owner of a law firm that maintains a 401K plan for all employees.

Defendant/Wife is self-employed and does not have access to a 401K plan, nor does she have a way to fund a retirement plan similar to that of Plaintiff/Husband. The only way she can fund a retirement plan is through savings.

**(6) Any equitable claim to, interest in, or direct or indirect contribution made to the acquisition of such marital property by the party not having title, including joint efforts or expenditures and contributions and services, or lack thereof, as a spouse, parent, wage earner or homemaker.**

Defendant/Wife moved from Massachusetts to North Carolina with Plaintiff/Husband to support him in his dream to become a successful lawyer and to own his own firm. While in North Carolina, she helped Plaintiff/Husband build his law firm and make it as successful as it is today by taking care of the family and the home so that Plaintiff/Husband could focus on excelling in his career. Defendant/Wife supported Plaintiff/Husband emotionally, financially, and in any other way he asked her to help. In so doing, Defendant/Wife sacrificed her ability to excel to the fullest level in her career.

**(7) Any direct or indirect contribution made by one spouse to help educate or develop the career potential of the other spouse.**

*See Factor (6) above.*

**(9) The liquid or nonliquid character of all marital property and divisible property.**

The primary liquid assets (the savings account and the CD) have all been spent but for the substantial savings account maintained by the partners in T&Z (estimated to be in excess of $1,000,000).

**(10) The difficulty of evaluating any component asset or any interest in a business, corporation or profession, and the economic desirability of retaining such asset or interest, intact and free from any claim or interference by the other party.**

The primary liquid assets were the CD and BOA 4906 and 5460 (which have all been spent already). The primary asset is Plaintiff/Husband's interest [in] T&Z, (which is complicated to value but which is economically desirable to keep given the

firm's profit margins).

Because of the downgrade in the residential real estate market, Plaintiff/Husband is going to be able to take both the Providence Glen Home and the Blowing Rock Home at a [sic] artificially low values. However, both of these assets have growth potential prospectively (and Plaintiff/Husband must agree with this assessment or else he would not have spent well over $100,000 in improving the Providence Glen Home cosmetically).

Since the DOS, Defendant/Wife has had to spend thousands of dollars to move herself and her furniture twice, [footnote omitted] and she will have to move a third time once she finds a permanent residence.

**(11)(a) Acts of either party to maintain, preserve, develop, or expand; or to waste, neglect, devalue or convert the marital property or divisible property, or both, during the period after separation of the parties and before the time of distribution.**

Defendant/Wife has been forced to spend the money she took from the CD to pay certain regular living expenses (for which Plaintiff/Husband was providing no support) and to defend herself in this protracted litigation. Defendant/Wife has had to pay in excess of Sixty Thousand Dollars and no/100 ($60,000) in noncompensable expert witness fees (only the trial time for with [sic] Mr. McDonald, Ms. Phillips, and Mr. Mitchell is compensable). Defendant/Wife will have incurred over Two Hundred Thousand Dollars and no/100 ($200,000) to try the issues in this case in the court system.

**(12) Any other factor which the court finds to be just and proper.**

Plaintiff/Husband is requesting that this Court award him all of the significant marital assets and allow him to enjoy all that he enjoyed during the marriage and more. All the while, Defendant/Wife has struggled to meet him on an even playing field and has not been allowed to enjoy a fraction of what she enjoyed during the marriage.

Plaintiff/Husband has not been fully cooperative in the process of valuing his interest in T&Z. As a result, Defendant/Wife has had to spend substantial amounts of time and money she does not have trying to get to the truth about Plaintiff/Husband's business and future revenue potential. The trial itself has been time-consuming and expensive on all levels for Defendant/Wife. Plaintiff/Husband is being represented by Ms. Wallace, hislong [sic] time friend,. [sic] Plaintiff/Husband testified that to date that [sic] he has only paid Ms. Wallace Fifty Thousand Dollars and no/100 ($50,000), which the Court notes (from having first hand experience of Ms. Wallace's hourly rate and attorney's fess [sic] bills) is extremely inexpensive (particularly in a contentious case such as this for which we have been in Court more than three (3) weeks in-the [sic] last eight (8) months).

The trial court awarded a total of $6,800 per month in permanent alimony to Shaffer and a total of $4,604 per month in child support to Shaffer. The trial court also held that Zurosky owed Shaffer $77,903 in retroactive child support from the date of the filing of his complaint, 3 December 2009, to 29

June 2012.[2]   The missing exhibits from the April Judgment were attached to the Amended Judgment & Order.

In its equitable distribution of property, the trial court assessed the date of separation ("DOS") and date of distribution ("DOD") value of the Blowing Rock Home.   The Blowing Rock Home is owned by Zurosky and his law partner Andre Tippens ("Mr. Tippens") as tenants in common.   In its equitable distribution order, the trial court found that

> 114. At all times prior to the initiation of this lawsuit, Defendant/Wife believed that her name was on the deed to the Blowing Rock Home.      Defendant/Wife had given Plaintiff/Husband a Power of Attorney to sign her name at closing, but she had no idea that she was never listed on the deed.
>
> . . .
>
> 117. During the marriage, Mr. Tippens used the house very rarely (no more than three (3) times since the residence was purchased). Instead, the parties and their children occupied the residence the majority of the time and frequently. The parties used the Blowing Rock Home as their primary vacation spot and spent weekends and holidays in the mountains. The Blowing Rock Home served a specific purpose for the parties, in that Defendant/Wife's chronic pain condition (which is described in greater detail hereinafter) was alleviated in colder/milder climates so that she tended

---

[2] In the record, the trial court states the date of the filing of the complaint as 3 December 2009.   However, the complaint was filed on 23 December 2009.

to feel much better physically while visiting the Blowing Rock Home.

. . .

119. Although Plaintiff/Husband testified multiple times that the Blowing Rock Home is the "T&Z firm" house, it is not the firm's asset or business property. It was not and currently is not used for business, and it serves no legitimate business purpose. It was not considered or valued as an asset of T&Z by either valuation expert.

120. The reality is that the Blowing Rock Home was Plaintiff/Husband and Defendant/Wife's personal vacation residence which Mr. Tippens pays for but used only infrequently prior to the DOS and has used no more frequently since the DOS.

121. The Court finds it credible that the only reason Defendant/Wife's name was not placed on the deed was because she was pregnant with [the parties' daughter] and did not participate in the closing or closing process. While this was not done intentionally to exclude Defendant/Wife, the result has been that Defendant/Wife has had no legal right to access the Blowing Rock Home since an unrelated third party owner, Mr. Tippens, has not allowed her access any more than has Plaintiff/Husband.

122. In the summer of 2009, Plaintiff/Husband locked Defendant/Wife out of the Blowing Rock Home and instructed her that she was no longer permitted to access, use, or enjoy the Blowing Rock Home. This has been difficult for Defendant/Wife not only because the Blowing Rock Home was a refuge from the heat for her, and it was a place

she enjoyed vacationing with her children.

> 123. After restricting Defendant/Wife's access to the Blowing Rock Home, Plaintiff/Husband has continued to use it himself together with [Zurosky's current wife], her children, and his children at various times. Plaintiff/Husband has no restrictions on his use of the home and will continue to enjoy the benefits of this vacation residence because Plaintiff/Husband and Mr. Tippens do not intend to sell the Blowing Rock Home or to use it as a rental.

The parties also stipulated that the fair market value of the Blowing Rock Home decreased by $123,000 from the DOS to the DOD. The trial court found this decrease was divisible property and distributed the decrease to Shaffer, although Zurosky received the Blowing Rock Home.

In evaluating the value of the law firm, both parties submitted expert appraisals of T&Z and proposed valuations in the FPTO. In the FPTO, Zurosky contended the value of the firm was $830,000 (DOS) and $450,000 (as of the FPTO); Schaffer, contended the value to be $1,038,000 (DOS) and $554,000 (as of the FPTO). In her order, the trial court agreed with Shaffer's expert that the DOS value of T&Z was $1,038,000 but found no credible evidence presented regarding the DOD value. Lacking such evidence the court held the DOS value of T&Z to be determinative of the DOD value.

The trial court also relied on jewelry valuations provided by Shaffer rather than expert testimony provided by Zurosky. Seven items of jewelry were considered in the equitable distribution order. The parties stipulated in the FPTO that all of the jewelry was marital property. Shaffer contended the total value of all jewelry items was $21,525 as of the DOS; Zurosky contended the total value was $74,060. Shaffer contended for the same values on the DOD; Zurosky contended for the same DOD values, except concerning Item E-13, a Tiffany brand platinum and diamond pendant. Zurosky contended that Item E-13 appreciated $450 from DOS to DOD. The trial court accepted Shaffer's valuations of all the jewelry, and all of the items of jewelry were distributed to Shaffer, except Item E-14 (a stainless steel and gold Rolex watch) that Zurosky received.

In its order, the trial court expressed concerns about the credibility of the evidence presented by Mr. Zurosky concerning his income.[3] Due to these concerns, the trial court relied on prior years' incomes rather than Zurosky's testimony concerning DOD income.

Zurosky filed timely written notice of appeal on 8 November

---

[3] In his financial affidavits, Zurosky reported a $16,000 deficit each month between his income and expenses. The trial court found the numbers submitted by Zurosky were inconsistent with his actual financial condition.

2013.

## II. Jurisdiction & Standard of Review

This Court has jurisdiction over Defendant's appeal because the equitable distribution judgment and child support and alimony orders are final judgments of a district court in a civil action under N.C. Gen. Stat. § 7A-27(b)(2) (2013).

Zurosky's issues on appeal concern equitable distribution, alimony, and child support; all of these issues are reviewed under an abuse of discretion standard. *Wieneck-Adams v. Adams*, 331 N.C. 688, 691, 417 S.E.2d 449, 451 (1992) ("Equitable distribution is vested in the discretion of the trial court and will not be disturbed absent a clear abuse of that discretion."); *Kelly v. Kelly*, ___ N.C. App. ___, ___, 747 S.E.2d 268, 272 (2013); *Leary v. Leary*, 152 N.C. App. 438, 441, 567 S.E.2d 834, 837 (2002) (citing *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)).

"Only a finding that the judgment was unsupported by reason and could not have been a result of competent inquiry, or a finding that the trial judge failed to comply with the statute . . . will establish an abuse of discretion." *Wieneck-Adams*, 331 N.C. at 691, 417 S.E.2d at 451 (internal citations omitted).

### III. Analysis

### A. Equitable Distribution Judgment

Pursuant to the North Carolina Equitable Distribution Act, the trial court is required to determine whether the property is marital or divisible and "'provide for an equitable distribution of the marital property and divisible property between the partie[s].'" *Mugno v. Mugno*, 205 N.C. App. 273, 276–77, 695 S.E.2d 495, 498 (2010) (quoting N.C. Gen. Stat. § 50-20 (2009)). The trial court must follow a three-step analysis in making an equitable distribution: "(1) identify the property as either marital, divisible, or separate property after conducting appropriate findings of fact; (2) determine the net value of the marital property as of the date of the separation; and (3) equitably distribute the marital and divisible property." *Id.* at 277, 695 S.E.2d at 498.

Marital property is

> all real and personal property acquired by either spouse or both spouses during the course of the marriage and before the date of the separation of the parties, and presently owned, except property determined to be separate property or divisible property in accordance with subdivision (2) or (4) of this subsection. Marital property includes all vested and nonvested pension, retirement, and other deferred compensation rights, and vested and nonvested military pensions eligible under the federal

Uniformed Services Former Spouses' Protection Act. It is presumed that all property acquired after the date of marriage and before the date of separation is marital property except property which is separate property under subdivision (2) of this subsection. It is presumed that all real property creating a tenancy by the entirety acquired after the date of marriage and before the date of separation is marital property. Either presumption may be rebutted by the greater weight of the evidence.

N.C. Gen. Stat. § 50-20(b)(1) (2013). Divisible property includes

a. All appreciation and diminution in value of marital property and divisible property of the parties occurring after the date of separation and prior to the date of distribution, except that appreciation or diminution in value which is the result of postseparation actions or activities of a spouse shall not be treated as divisible property.

b. All property, property rights, or any portion thereof received after the date of separation but before the date of distribution that was acquired as a result of the efforts of either spouse during the marriage and before the date of separation, including, but not limited to, commissions, bonuses, and contractual rights.

c. Passive income from marital property received after the date of separation, including, but not limited to, interest and dividends.

d. Passive increases and passive decreases in marital debt and financing charges and interest related to marital debt.

N.C. Gen. Stat. § 50-20(b)(4)(2013). Regarding the distribution phase, "there shall be an equal division by using net value of marital property and net value of divisible property" unless that result would be inequitable. N.C. Gen. Stat. § 50-20(c). "However, the trial court may conclude, within its discretion, that unequal distribution is equitable after considering the factors listed in N.C. Gen. Stat. § 50–20(c) and making sufficient findings of fact to support its conclusion." *Mugno*, 205 N.C. App. at 277, 695 S.E.2d at 498; *see also* discussion of Section 50-20(c) factors *supra*.

Zurosky argues the trial court erred in its equitable distribution order by (1) distributing the diminution in value of the Blowing Rock Home between DOS and DOD to Shaffer; (2) attaching exhibits to the order that were inconsistent with the written judgment; (3) deviating from the stipulations of the parties in the FPTO; (4) calculating the diminution in value between the DOS and DOD of Zurosky's interest in T&Z; and (5) erroneously calculating the value of the parties' jewelry. We address each in turn.

**1. Diminution in Value of the Blowing Rock Home**

In the FPTO, the parties assigned $568,000 as the DOS fair market value of the entire Blowing Rock Home and $445,000 as the

DOD fair market value of the Blowing Rock Home, owned by Zurosky and his law partner Mr. Tippens as tenants-in-common. The trial court classified Zurosky's one-half tenant-in-common interest in the Blowing Rock home as marital property. Zurosky and Mr. Tippens continued to pay the Blowing Rock Home's mortgage from DOS to DOD. On the DOD, the outstanding mortgage balance on the Blowing Rock Home was $411,959.00. The net equity of the Blowing Rock Home on the DOD was distributed to Zurosky. The marital estate's portion of the passive loss ($61,500) was classified as divisible property and was distributed to Ms. Shaffer.

In distributing the passive loss, the trial court relied on *Wirth v. Wirth*, 204 N.C. App. 372, 696 S.E.2d 202, 2010 WL 2163367 (2010) (unpublished) ("*Wirth II*").[4] Zurosky argues that relying on this case was erroneous because it was an unpublished decision of this court and because the "plain language of N.C. Gen. Stat. § 20(b)(4)" presumes that the diminution in value of a marital asset is divisible unless the trial court finds that the change was the result of postseparation actions taken by one spouse. *Wirth v. Wirth*, 193 N.C. App. 657, 668 S.E.2d 603

---

[4] The trial court wrote in its order "*Wirth v. Wirth*, 204 NC 372, 696 S.E.2d 202 (2010)," apparently intending to refer to the unpublished decision of this court cited above.

(2008) ("*Wirth I*").[5]

Zurosky contends on appeal that the trial court's decision with respect to this issue was erroneous because it was manifestly unsupported by reason such that the evidence reveals no rational basis for the distribution. Zurosky contends that there is a legal presumption that all appreciation and diminution in value of the marital and divisible property must be distributed with the property unless the court finds that the change in value is attributable to the postseparation actions of one spouse. Essentially, Zurosky argues that since the court distributed the Blowing Rock property to him, its diminution in value should also have been distributed to him absent a court finding of misconduct on his part. We disagree.

In making its equitable distribution, the trial court relied extensively on the Section 50-20(c) factors and cited competent evidence in support of its findings, quoted in their entirety *supra*. The trial court also cited *Wirth II* to support the distribution of the diminution in value to Shaffer despite the fact that Shaffer did not receive the property. Although *Wirth II* is an unpublished opinion, an unpublished opinion may

---

[5] Zurosky cites N.C. Gen. Stat. § 20(b)(4) (2013) in his brief, which is clearly a typographical error. We assume Zurosky intended to cite N.C. Gen. Stat. § 50-20(b)(4), which includes the definition of divisible property and is quoted *supra*.

be used as persuasive authority at the appellate level if the case is properly submitted and discussed and there is no published case on point. *State ex rel. Moore Cnty. Bd. Of Educ. v. Pelletier*, 168 N.C. App. 218, 222, 606 S.E.2d 907, 909 (2005); *CaroMont Health, Inc. v. N.C. Dep't of Health & Human Servs. Div. of Health Serv. Regulation, Certificate of Need Section*, ___, N.C. App. ___, ___, 751 S.E.2d 244, 255 (2013). We see no reason why this principle should not apply in the trial courts and agree that *Wirth II* supports the trial court's decision.

In *Wirth II*, this Court approved a distribution of the entire passive loss of an asset to the party that did not receive the asset. 2010 WL 2163367 at *5. The asset at issue was a general contracting business. *Id.* at *1. The defendant in *Wirth II* argued, much like Zurosky, that "when dealing with divisible property consisting of post date of separation diminution in value of an asset, the trial court should always distribute the divisible property to the same party to whom the marital asset is distributed." *Id.* at *5 (alterations omitted).

*Wirth II* noted that the defendant in that case, as here, did not cite authority requiring the trial court to distribute an entire passive loss to "to the party who received the

depreciated asset." *Id.* *Wirth II* is also persuasive because it recognized the premise upon which equitable distribution awards are based, namely that assets in an equitable distribution are to be *considered in their totality*, that equitable distribution of marital and divisible property is within a trial court's discretion, and that the division is performed under equitable principles that are, "*inter alia*, 'consistent with principles of justice and right.'" *Id.* at *6 (quoting Black's Law Dictionary 617 (9th ed. 2004)). As in *Wirth II*, "[i]n some circumstances, it is certainly most appropriate that a divisible loss should be distributed to the party who has received the related asset. However, *in light of the entire equitable distribution judgment, the previous opinion of this Court, and the record before us*, we cannot now say that the trial court abused its discretion" in distributing the entire passive loss to Shaffer as part of its equitable distribution judgment. *Id.* (emphasis added).

However, the trial court did not have to rely solely upon *Wirth II* and its reliance upon that decision was essentially lagniappe offered to provide an example in which this Court had approved distributing the passive loss associated with an asset to the party who did not receive the asset in question as part of an equitable distribution judgment. Since the trial court

considered the Section 50-20(c) factors, discussed *supra*, and since its findings related to these factors were supported by competent evidence, it was within the trial court's discretion to distribute the loss to Shaffer so the trial court did not err in doing so.

Because the trial court conducted the proper analysis under N.C. Gen. Stat. § 50-20(c) and its conclusions were supported by findings that were, in turn, supported by competent evidence, the trial court did not abuse its discretion by distributing the diminution in value to Shaffer despite the fact that Zurosky received the asset. We do not find the statutory presumption contained in N.C. Gen. Stat. § 50-20(b) to be of assistance to Zurosky, since the statute explicitly allows appreciation and diminution to be characterized as "divisible," and since the trial court specifically found that the diminution in value at issue here was divisible property. As such, appreciations and diminutions may be divided among the parties, even if the asset is distributed to one party while the passive loss is distributed to another. Accordingly, we affirm the trial court's distribution of the diminution in value of the Blowing Rock Home to Shaffer.

**2. Attached Exhibits**

Zurosky next argues that the trial court erred in attaching exhibits that were inconsistent with the decretal provisions in the Amended Judgment & Order.  We agree.

Clerical mistakes are "mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission . . . ."  N.C. R. Civ. P. 60.  A clerical error is defined as "[a]n error resulting from a minor mistake or inadvertence, esp[ecially] in writing or copying something on the record, and not from judicial reasoning or determination." *State v. Jarman*, 140 N.C. App. 198, 202, 535 S.E.2d 875, 878 (2000) (citation and quotation marks omitted).  "When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth."  *State v. Smith*, 188 N.C. App. 842, 845, 656 S.E.2d 695, 696–97 (2008) (citations and quotations marks omitted).

Here, the trial court attached a version of Exhibit B to the Amended Judgment & Order that did not correspond with the findings of fact and decretal section in the Amended Judgment & Order.  In Exhibit B, the trial court awarded Shaffer fifty-five percent of the property and a distributive award of $771,620.

However, in the findings of fact and decretal section, the trial court awarded Shaffer an equal distribution of property and a distributive award of $647,965.50 (after Rule 37 Sanctions). In the Amended Judgment & Order, the trial court referenced the distributions outlined in both the findings of fact and Exhibit B, which conflict.

While Zurosky urges this Court to vacate the order in its entirety, we decline the invitation. Although we agree Exhibit B conflicts with the distribution described in the order, the errors do not merit vacating the order in its entirety. The errors made by the trial court are more properly considered clerical errors. Accordingly, we remand this case to the trial court to correct any inconsistencies between Exhibit B and the order.

**3. Deviation from the FPTO**

Zurosky next argues the trial court erred in its distribution of property because the trial court failed to adhere to stipulations concerning five items contained in the FPTO. We agree with respect to the 2009 tax returns, but disagree concerning the other four items discussed by Zurosky.

N.C. Gen. Stat. § 50-20(d) (2013) provides:

> Before, during or after marriage the parties may by written agreement, duly executed and

> acknowledged in accordance with the provisions of G.S. 52-10 and 52-10.1, or by a written agreement valid in the jurisdiction where executed, provide for distribution of the marital property or divisible property, or both, in a manner deemed by the parties to be equitable and the agreement shall be binding on the parties.

Where an agreement provides for distribution of the parties' marital or divisible property, or both types of property, the agreement will be enforced. *Brenenstuhl v. Brenenstuhl*, 169 N.C. App. 433, 435–36, 610 S.E.2d 301, 303 (2005). In such agreements, parties may stipulate to the classification, value and distribution of property. *See Sharp v. Sharp*, 116 N.C. App. 513, 521, 449 S.E.2d 39, 43 (1994). Further:

> Courts look with favor on stipulations designed to simplify, shorten, or settle litigation and save cost to the parties, and such practice will be encouraged. *While a stipulation need not follow any particular form, its terms must be definite and certain in order to afford a basis for judicial decision*, and it is essential that they be assented to by the parties or those representing them. Once a stipulation is made, a party is bound by it and he may not thereafter take an inconsistent position.

*Stovall v. Stovall*, 205 N.C. App. 405, 409, 698 S.E.2d 680, 683 (2010) (citations, quotation marks, and alterations omitted) (emphasis added). Stipulations are also considered in the same manner as a typical contract between two parties. *Id.* at 409–

10, 698 S.E.2d at 684.

Here, Zurosky argues the trial court departed from the FPTO regarding: (1) the reward points associated with the Merrill Accolades American Express Rewards charge card ("Item L-23"); (2) the miles and debt related to the US Airways Dividend Miles charge card ("Item L-24"); (3) the miles and debt related to a second US Airways Dividend Miles charge card ("Item L-25")[6]; (4) the disbursement from the Northwestern Mutual Policy #6959 ("Item I-18"); and (5) 2009 state and federal tax refunds. We address each item below.[7]

**(i) Item L-23 – Merrill Accolades Reward Points**

The trial court found that the reward points associated with Item L-23 were marital property; however, the trial court did not distribute this asset. The trial court found that it could not value Item L-23 on the DOS, so the property remained with the titled owner and was not distributed.

In the FPTO, the parties stipulated that Item L-23 was

---

[6] The charge cards in L-24 and L-25 were related to separate accounts.

[7] Zurosky does not argue that the trial court erred in failing to distribute the property, but only that the order was incorrect because it did not adhere to the stipulations concerning each piece of property. As such, we do not address whether the trial court erred in choosing not to assign a value to these five items, but only whether the trial court erred in not enforcing the stipulations associated with each item.

marital, but otherwise did not reach an agreement about it. Zurosky contended Item L-23 had no value both on the DOS and at present. Shaffer, on the other hand, contended the DOS and current values of Item L-23 were forty-eight dollars. Zurosky also contended that he should receive Item L-23, while Shaffer contended Item L-23 should be distributed to both herself and Zurosky.

The foregoing constitutes ample evidence showing the parties disagreed as to the value and distribution of Item L-23. The trial court made the determination that the parties agreed on, namely that Item L-23 was marital property. Accordingly, we hold the trial court did not err with respect to Item L-23.

**(ii) Item L-24 – US Airways Dividend Miles #1**

The trial court found that Item L-24 was marital property, but did not distribute Item L-24. Instead the trial court left Item L-24 with its titled owner, Shaffer. The court could not determine the DOS number or value of Item L-24. In the FPTO, the parties agreed Item L-24 was marital and should be distributed to Shaffer. However, the parties did not agree about the associated value of the miles. Zurosky contended that the airline miles' value as of the DOS and current value was unknown. Shaffer contended Item L-24 had no value on the DOS

and nor did it have value currently.

As with Item L-23, the foregoing provides ample evidence to show the parties did not fully stipulate to the value of Item L-24. The trial court enforced the portion of the FPTO that the parties agreed on, that Item L-24 was marital property and that Shaffer should receive the property. Accordingly, the trial court did not err with respect to Item L-24.

### (iii) Item L-25 US Airways Dividend Miles #2

The trial court found that Item L-25 was marital property and split the property equally between the titled owners. In the FPTO, the parties agreed that Item L-25 was marital. However, the parties did not agree as to the value or distribution of Item L-25. Zurosky contended both the DOS and current value of the property was zero dollars. Shaffer did not assign a DOS or current value for the property and marked "TBD" (to be determined) for the value. Zurosky contended that he should receive the property. Shaffer contended the property should be distributed to both parties.

The trial court found the property was marital, as agreed to in the FPTO. However, as with Item L-23 and Item L-24, the foregoing is ample evidence to show the parties did not fully stipulate to the value or distribution of Item L-25.

Accordingly, the trial court did not err with respect to Item L-25.

**(iv) Item I-18 – Northwestern Mutual Policy**

The trial court classified Item I-18 as marital property and made a series of interim distributions after DOS but prior to DOD. The trial court distributed $17,377 of the policy to Zurosky, which he used to pay the real property taxes associated with the Providence Glen Home. The order allowing this disbursement to Zurosky was made for the purpose of satisfying the property tax obligations associated with the former marital home. Within the order allowing this disbursement, the parties also "reserve[d] the right to argue as to the classification and distribution of the funds at the Equitable Distribution trial." The trial court later distributed $34,000 to Shaffer on 1 November 2011 and $40,000 on 5 November 2011 as part of equitable distribution.

In its equitable distribution judgment, the trial court found that Item I-18 was marital property and that the DOD value of Item I-18 was $18,000, which the trial court distributed to Shaffer. In finding of fact 111, the trial court also found the decrease in property tax debt on the Providence Glen Home ($17,502.75) was divisible property and distributed the decrease

equally between the parties.

The parties stipulated in the FPTO that the DOS value of Item I-18 was $105,922. The parties also stipulated that Zurosky and Shaffer should each receive part of Item I-18. However, the parties did not agree on the current value of Item I-18. Zurosky valued the property at $18,000, and Shaffer commented that she had no records concerning the current value of Item I-18.

Zurosky argues that the trial court's equal distribution of the $17,502 decrease in the Providence Glen Home's property taxes violated the FPTO. However, in the prior consent order which allowed the $17,377 disbursement from the insurance policy to Zurosky, both parties reserved the right to dispute the classification and distribution of the property. Additionally, the FPTO includes stipulations concerning Item I-18, not the decrease in property taxes on the Property Glen Home, which is what is addressed in the finding of fact that Zurosky contests. As such, the trial court did not err in distributing the decrease in property taxes equally, since the parties did not fully stipulate to the division of the decrease prior to the equitable distribution judgment and retained the right to

contest the classification and distribution of the property.[8]

**(v) 2009 Tax Refunds**

Finally, the trial court found that the 2009 tax refunds were "not marital or divisible property." The trial court found that Zurosky and Shaffer filed a joint return for their 2009 taxes that provided for any refund to be applied to Zurosky's individual 2010 state and federal tax returns. The total tax refunds from 2009 were $69,919.[9]

Zurosky and Shaffer both stipulated in the FPTO that the 2009 tax refunds were divisible property.[10] The parties did not stipulate as to the value of the 2009 tax refunds; Zurosky contended the refund's value was $4,135 and Shaffer contended that the refund's value was $5,827.

Rather than divide the property or make a finding that the evidence of value was not sufficiently credible to allow

---

[8] The parties also did not fully stipulate to the remaining value of Item I-18 itself. The trial court correctly classified Item I-18 according to the parties' stipulation (specifically that the property was marital) and distributed the property to Shaffer.

[9] This figure includes $57,321 in federal tax refunds and $12,598 in state tax refunds.

[10] In Shaffer's appellate brief, she also states, "the parties stipulated that the funds [the tax returns] were divisible . . . ."

allocation of the 2009 tax refunds, the trial court found that the 2009 tax refunds were neither marital nor divisible property and made no division.  This was in error, since the parties stipulated that this property was divisible.  As such, we reverse and remand this case to the trial court to reclassify the property as divisible and to distribute the property if there is credible evidence supporting the value of the asset.[11]

## 4. Valuation of T&Z

In an equitable distribution case, the trial court is the fact-finder.  *Grasty*, 125 N.C. App. at 739, 482 S.E.2d at 754.  Fact-finders have a right to believe all, none, or some of a witness' testimony.  *Brown v. Brown*, 264 N.C. 485, 488, 141

---

[11] This Court has held that a trial court is obligated to make specific findings regarding the value of property in an equitable distribution order. *Poore v. Poore*, 75 N.C. App. 414, 422, 331 S.E.2d 266, 272, *disc. rev. denied*, 314 N.C. 543, 335 S.E.2d 316 (1985).  However, the obligation to assign a value to marital property in an equitable distribution exists only when there is credible evidence supporting a finding concerning the value of the asset.  *Albritton v. Albritton*, 109 N.C. App. 36, 40–41, 426 S.E.2d 80, 83–84 (1993).

Whether evidence is credible is in the discretion of the trial court. *Grasty v. Grasty*, 125 N.C. App. 736, 739, 482 S.E.2d 752, 754, *disc. rev. denied* 346 N.C. 278 (1997).  Accordingly, a trial court is not *required* to distribute marital property if there is not sufficient evidence of value.  *Id*; *see also* 1 N.C. Family Law Practice § 6:41 ("If the only evidence concerning a particular asset is 'wholly incredible and without reasonable basis' the asset need not be valued in an equitable distribution proceeding.").

S.E.2d 875, 877 (1965). Subjective opinions about the value of property are admissible and competent. *Responsible Citizens in Opposition to Flood Plain Ordinance v. City of Asheville*, 308 N.C. 255, 271, 302 S.E.2d 204, 214 (1983). An appellate court should not "second-guess values of . . . property where there is evidence to support the trial court's figures." *Crutchfield v. Crutchfield*, 132 N.C. App. 193, 197, 511 S.E.2d 31, 34 (1999) (citations and quotations omitted). We apply these principles to both the diminution in value of T&Z as well as the valuation of the jewelry Zurosky contests.

**(a) Active or Passive Changes**

Zurosky argues the trial court erred in its distribution of the diminution in value of T&Z because there was not a finding that the decrease was an active change. We disagree first that the trial court erred by deviating from the FPTO, as the parties did not stipulate to the divisibility of Zurosky's interest in T&Z.[12] We also disagree with Zurosky's contention that the trial court erred in distributing the diminution in value of T&Z to Shaffer because there was no diminution in value under the trial court's equitable distribution judgment.

The trial court specifically found there was no credible

---

[12] Shaffer specifically marked "ND" for Not Divisible in the FPTO.

evidence concerning the DOD value of T&Z and accordingly used the same value at DOS and DOD: $1,038,000. The trial court stated in finding of fact 264 that there was no need to determine the active versus passive components of the change in value from the DOS to the DOD, which is correct because the DOD and DOS values are equal under the equitable distribution order. Without a diminution in value, there is not an active or passive change to consider, and the trial court did not err in choosing not to determine active or passive components for a net change of $0 between DOS and DOD. We next consider Zurosky's arguments concerning the valuation of T&Z the trial court chose to accept.

**(b) DOD Value of T&Z**

Zurosky argues the trial court erred in its valuation of Zurosky's interest in T&Z. We disagree. Both parties hired business valuation experts to calculate the value of Zurosky's interest in T&Z. Zurosky's expert, Ms. Foneville, calculated T&Z's DOS value as $830,000 and DOD value as $450,000. Shaffer's expert, Mr. Mitchell, calculated T&Z's DOS value as $1,038,000 and DOD value as $554,000. The trial court accepted Mr. Mitchell's estimate for the DOS value of T&Z. The trial court found Mr. Mitchell's report addressed excess cash more thoroughly, contained a more accurate depiction of the owners'

compensation, and did not contain the errors in calculations found in Ms. Foneville's report. The trial court also commented that Shaffer was at a disadvantage in gathering information pertaining to T&Z's value.

However, the trial court declined to accept Ms. Foneville or Mr. Mitchell's estimate of the DOD value. The trial court found the reports to be unreliable because the reports were dated six months apart and Mr. Mitchell's report was nine months old at the DOD. Further, the trial court considered the success of T&Z in 2012. Both experts computed the DOD value using T&Z's 2011 numbers. The trial court, finding the DOD values to be unreliable, chose to distribute the property at the DOS value ($1,038,000).

The trial court did not err in its use of the DOS value of T&Z. "The credibility of the evidence in an equitable distribution trial is for the trial court." *Grasty*, 125 N.C. App. at 739, 482 S.E.2d at 754. If the trial court finds evidence to be unreliable, it does not err in failing to value that asset using the unreliable evidence. *Id.* at 739, 482 S.E.2d at 754. Accordingly, it was within the trial court's discretion to use T&Z's DOS value instead of the DOD values provided by experts.

## 5. Valuation of Jewelry

Zurosky next argues the trial court erred in its valuation of the parties' jewelry. The trial court relied on jewelry valuations provided by Shaffer rather than expert testimony provided by Zurosky. Zurosky's expert, Joey Stagnone, provided current values for some of the parties' jewelry. Stagnone estimated the current value of the platinum three-stone diamond ring as ten to twenty thousand dollars more than the DOS value. Stagnone also assigned a current value of $450 more than the DOS value for the Tiffany platinum and diamond "pinched heart" pendant. Shaffer estimated the DOS and current values of the jewelry to be between twenty-five to thirty percent of the purchase price. The trial court decided Zurosky's expert was not credible. As the fact-finder, the trial court is allowed to weigh the credibility of testimony. Accordingly, it was within the trial court's discretion to rely on Shaffer's values instead of the values given by an expert, and the trial court did not abuse its discretion.

### B. Child Support and Alimony Order

### 1. Computation of Zurosky's Income

Zurosky next argues the trial court erred in its award of alimony and child support because the trial court failed to use

his actual income at the time of the order. We disagree.

A party's actual income at the time of the order is typically considered. *Megremis v. Megremis*, 179 N.C. App. 174, 182, 633 S.E.2d 117, 123 (2006) (citing *Kowalick v. Kowalick*, 129 N.C. App. 781, 787, 501 S.E.2d 671, 675 (1998)). However, if a party acts in bad faith (e.g. deliberately depressing income or excess spending) the trial court may consider a spouse's capacity to earn. *Id.; Hartsell v. Hartsell*, 189 N.C. App. 65, 77, 657 S.E.2d 724, 731 (2008).

In *Diehl v. Diehl*, 177 N.C. App. 642, 630 S.E.2d 25 (2006), the trial court did not make a finding of bad faith or have evidence that the spouse deliberately depressed his income; the trial court used prior years' incomes because the trial court did not have sufficient evidence regarding his actual income. *Id.* at 649-50, 630 S.E.2d at 30-31. In *Diehl*, the husband's numbers were considered "highly unreliable," forcing the trial court to rely on previous years' income. *Id.* at 650, 630 S.E.2d at 30.

Here, the trial court did not expressly make a finding of bad faith or find that Zurosky schemed to deliberately depress his income. As in *Diehl*, the trial court expressed concerns about Zurosky's reported income and found that Zurosky's numbers

were not credible. The trial court did not find Zurosky's reported income to be credible for several reasons: (i) Zurosky overstated his monthly tax payments; (ii) Zurosky reported he was operating at a significant deficit each month; (iii) Zurosky did not report a significant amount of spending in his financial affidavits; and (iv) the evidence conflicted concerning Zurosky's work habits post-DOS. To properly determine alimony and child support, the trial court relied on Zurosky's net income from 2003-08 as a reliable statement of his income.

Zurosky argues *Godley v. Godley*, 110 N.C. App. 99, 429 S.E.2d 382 (1993) controls this case. In *Godley*, this Court held the trial court erred by considering a spouse's income from 1984-88 for purposes of entering a judgment filed in 1991. *Id. at* 118, 429 S.E.2d at 393. However, the trial court in *Godley* did not find, as here, that the spouse provided unreliable income figures and expressed no concern about the income reported at the time of distribution; the trial court simply chose a different timespan to determine the spouse's income. *Id.* at 118, 429 S.E.2d at 393. *Godley* simply re-states the general rule that income at the time of the order is typically considered, and this Court then applied that general rule. *Id.* at 118, 429 S.E.2d at 393; *Megremis*, 179 N.C. App. at 182, 633

S.E.2d at 123.

This case is analogous to *Diehl*, as there were several concerns expressed by the trial court over the reliability of Zurosky's reported income. Zurosky also argues this case is distinguishable from *Diehl* because the trial court in *Diehl* used income from the two years preceding the order, and in this case, the trial court used Zurosky's income over a longer span, from 2003-08. *Id.* at 650-51, 630 S.E.2d at 31. We also disagree with this contention; the trial court's use of Zurosky's 2003-08 income simply reflects a choice by the trial court to consider Zurosky's income before Zurosky had reason to alter the reported figure. Accordingly, the trial court's use of Zurosky's income between 2003-08 was rational given the state of the evidence and did not constitute an abuse of discretion.

## 2. Retroactive Child Support

Zurosky's final argument is that the trial court erred in awarding retroactive child support. We disagree and hold there was sufficient evidence to support the trial court's award. We remand to correct certain clerical errors within the trial court's order.

N.C. Gen. Stat. § 50-13.4(c) (2013) includes a presumption that the trial court shall apply the North Carolina Child

Support Guidelines ("Guidelines"), which are promulgated by the Conference of Chief District Judges under the authority granted by N.C. Gen. Stat. § 50-13.4(c1) (2013).[13] The Guidelines also include certain presumptions which place child support orders outside of the Guidelines. *See Loosvelt v. Brown*, ___ N.C. App. ___, ___, ___ S.E.2d ___, ___, COA13-747, 2014 WL 3409156 at *7-8 (2014); *see also* Guidelines, 2014 Ann. R. N.C. 50, *available at* http://www.nccourts.org/forms/documents/1226.pdf. One such presumption is that "[i]n cases in which the parents' combined adjusted gross income is more than $25,000 per month ($300,000 per year), the supporting parent's basic child support obligation cannot be determined by using the child support schedule." Guidelines, 2014 Ann. R. N.C. 50. Here, the trial court found as fact that the parties' combined gross income was $61,011 per month, placing the parties' child support obligations outside of the Guidelines. Neither party disputes that the present case is properly outside of the Guidelines.

---

[13] We also note that the General Assembly recently passed legislation which amends the obligation of the Conference of Chief District Judges to require it to prescribe guidelines for the computation of child support obligations in retroactive support cases. *See* N.C. Sess. Laws 2014-77, § 8. This statute was effective at the time it was passed, 15 July 2014, and is not applicable to the present matter.

Prospective child support is support awarded from the time a party files a complaint for child support to the date of trial. *Taylor v. Taylor*, 118 N.C. App. 356, 361, 455 S.E.2d 442, 446 (1995), *rev'd on other grounds*, 343 N.C. 50, 468 S.E.2d 33 (1996); *see also Carson v. Carson*, 199 N.C. App. 101, 105, 680 S.E.2d 885, 888 (2009). For prospective child support in *a non-Guidelines* child support case, the trial court must consider several factors to establish a child support obligation:

> Payments ordered for the support of a minor child shall be in such amount as to meet the reasonable needs of the child for health, education, and maintenance, having due regard to the estates, earnings, conditions, accustomed standard of living of the child and the parties, the child care and homemaker contributions of each party, and other facts of the particular case.

N.C. Gen. Stat. § 50-13.4(c); *see also Loosvelt*, ___ N.C. App. at ___, ___ S.E.2d at ___, 2014 WL 3409156 at *6.

Retroactive child support is support "awarded prior to the time a party files a complaint. . . ." *Taylor*, 118 N.C. App. at 361, 455 S.E.2d at 446. Retroactive child support has two varieties, as outlined in *Biggs v. Greer*, 136 N.C. App. 294, 524 S.E.2d 577 (2000):

> The distinction between two types of retroactive support is pertinent *sub judice.* In the absence of an existing child support order, an amount of child support awarded

> prior to the date a party files a complaint therefor is properly classified as retroactive child support and is not based on the presumptive Guidelines. Although prospective child support based upon the presumptive Guidelines requires no factual findings regarding the child's reasonable needs or the supporting parent's ability to pay, the trial court must set out specific findings of fact in a reimbursement award for retroactive support, so as to reflect the court's consideration of the reasonably necessary actual expenditures under G.S. § 50-13.4(c) made on behalf of the child as well as the defendant's ability to pay during the period in the past for which retroactive support is sought.
>
> The second type of retroactive child support is that involved herein, *i.e.*, a retroactive increase in the amount provided in an *existing support order.*

*Id.* at 300-01, 524 S.E.2d at 583 (citations, alterations, and quotation marks omitted) (emphasis in original). In the case *sub judice*, there is no prior child support order so we apply the standard applicable to the first variety of retroactive child support. Accordingly, the trial court applies an identical standard to both prospective and retroactive child support payments; the standard outlined in N.C. Gen. Stat. § 50-13.4(c) that considers the parties' ability to pay as well as the reasonably necessary expenses made on behalf of the child.

The trial court ordered child support from 3 December 2009, the date the trial court listed for the filing of Zurosky's

complaint, to 29 June 2012, the final hearing date.[14] Shaffer did not file a complaint seeking child support until 24 February 2010. Thus, there are two periods of child support granted under the trial court's order. The first is a retroactive child support award from 3 December 2009 to 24 February 2010 as listed on the order. This period is retroactive because it is an award granted prior to Shaffer's filing of a child support claim. *Taylor*, 118 N.C. App. at 361, 455 S.E.2d at 446. The second period spans from 24 February 2010 to 29 June 2012, or the period from the filing of the complaint to the final hearing date. This is prospective child support. *Id.*

We must next determine whether the trial court made sufficient findings under the relevant factors set forth in N.C. Gen. Stat. § 50-13.4(c) to support the retroactive and prospective child support awards. Here, there were long-form financial affidavits filed with the trial court as well as Shaffer's testimony concerning the children's reasonable and necessary expenses. The trial court made extensive findings of fact concerning the parents' income levels, the children's health, activities, educational needs, travel needs, entertainment, work schedules, living arrangements, and other

---

[14] As provided above, the actual date Zurosky filed his complaint was 23 December 2009.

household expenses. After careful review, we determine that sufficient evidence existed for (i) the trial court's award of retroactive child support from the filing of Zurosky's complaint on 3 December 2009 to the 24 February 2010 filing of Shaffer's child support complaint and (ii) the trial court's award of prospective child support from 24 February 2010 to 29 June 2012.

As noted above, the trial court used an incorrect date for both (a) the date the child support complaint was filed and (b) the date Zurosky filed his complaint. The trial court also mislabeled the type of child support provided in the relevant periods outlined above. We remand this portion of the trial court's order to correct these errors consistent with this opinion.

## IV. Conclusion

For the reasons stated above, the trial court's judgment order is

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

Judges ERVIN and DAVIS concur.